NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2015 VT 108

No. 2014-240

| | |
|---|---|
| David A. Gauthier | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Washington Unit, |
| | Civil Division |
| | |
| Keurig Green Mountain, Inc. f/k/a | December Term, 2014 |
| Green Mountain Coffee Roasters, Inc. | |

Helen M. Toor, J.

Oreste V. Valsangiacomo, Jr. of Valsangiacomo, Detora & McQuesten, P.C., Barre, for
  Plaintiff-Appellant.

Kerin E. Stackpole, Kristina R. Brines and Emily E. Chamberlain of Paul Frank + Collins P.C.,
  Burlington, for Defendant-Appellee.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1. **EATON, J.** David A. Gauthier appeals the Washington Superior Court, Civil Division's entry of summary judgment in favor of employer Green Mountain Coffee Roasters[1] (Green Mountain) on his complaint for workers'-compensation retaliation and denial of his motion to amend his complaint.[2] We affirm.

---

[1] At some point after the inception of this litigation, but prior to this appeal, employer Green Mountain Coffee Roasters, Inc. changed its name to Keurig Green Mountain, Inc. Because employer's name was still Green Mountain Coffee Roasters, Inc. during the proceeding below, we refer to employer as "Green Mountain."

[2] At oral argument, counsel for Gauthier raised an issue regarding the trial court's handling of discovery. Given that the matter was not briefed by either party, this argument is

¶ 2. As a preliminary matter, we address Green Mountain's motion to strike certain portions of Gauthier's printed case on the ground that it contains certain excerpts from Gauthier's deposition and two pages from Green Mountain's employee handbook that were not submitted to the trial court in the proceeding below by either party and thus are not part of the record on appeal. See V.R.A.P. 10(a)(1) (setting forth, in relevant part, that "[t]he record on appeal consists of the original documents, data, and exhibits filed . . . in the superior court" (emphasis added)); V.R.A.P. 30(a)(1) (requiring appellant to prepare a printed case "containing extracts from the record that are necessary to present fully the questions raised" (emphasis added)).

¶ 3. Gauthier responds that he is not seeking to introduce "entirely new document[s]" and contends that the portions of his printed case that Green Mountain seeks to strike are "merely certain pages of his deposition transcript, large portions of which were presented to the trial court." Gauthier also contends that the cited portions of his printed case go to the weight of the evidence, provide context, or are established by other parts of the record.

¶ 4. There is no merit to Gauthier's contentions, and thus we grant the motion to strike. Our review of the trial-court record reveals that the deposition excerpts and employee-handbook pages that Green Mountain seeks to strike from Gauthier's printed case were never "filed . . . in the superior court" and accordingly they are not part of the record before us, V.R.A.P. 10(a)(1), and thus are inappropriate for inclusion in Gauthier's printed case, V.R.A.P. 30(a)(1). That other portions of Gauthier's deposition transcript may have been submitted into the record in the proceeding below does not automatically convert the entire transcript into

waived and we decline to address it. See TD Banknorth, N.A. v. Dep't of Taxes, 2008 VT 120, ¶ 33, 185 Vt. 45, 967 A.2d 1148 (declining to address claim not briefed and raised for first time at oral argument); see also State v. Sullivan, 2013 VT 71, ¶ 26 n.*, 194 Vt. 361, 80 A.3d 67 (recognizing that "[a]lthough [this Court] retain[s] the discretion to take up issues raised at oral argument, we usually do not").

record material that this Court may review on appeal. See V.R.A.P. 10(a)(1), 30(a)(1) (establishing what may constitute the record on appeal and what may be included in an appellant's printed case); see also Napro Dev. Corp. v. Town of Berlin, 135 Vt. 353, 355, 376 A.2d 342, 345 (1977) (granting motion to strike materials "not properly before us because they are not part of the record"). To the extent other materials that are properly part of the record on appeal establish the same or similar points, they are appropriately included in Gauthier's printed case and we shall consider them. Given our posture in reviewing a summary-judgment decision, in determining whether there is a genuine dispute as to a material fact, we will accept as true the facts as alleged by Gauthier where they are supported by the portions of the record developed in front of the trial court, giving Gauthier "the benefit of all reasonable doubts and inferences." See Robertson v. Mylan Labs., Inc., 2004 VT 15, ¶ 15, 176 Vt. 356, 848 A.2d 310.

¶ 5.    Accordingly, the record developed before the trial court reveals the following material facts. Gauthier began work at Green Mountain in May 2007 on an at-will basis as a full-time maintenance technician and was responsible for maintaining and repairing production machinery. His shifts were Sunday through Tuesday, 5 a.m. to 5 p.m., and every other Saturday. Gauthier did not have his own work computer, but would routinely use internet-enabled Green Mountain computers during his workday to assist with his job duties, including using in-house software to locate a part number for a machine part. In order to access a Green Mountain computer, he would enter his Green Mountain computer credentials, consisting of a unique user ID and password. Occasionally, Gauthier would need to leave his computer logged in and attend to a maintenance request. Several times over the course of his employ, Gauthier would return from the maintenance job to discover that someone had changed the settings on his computer, including the background image on his desktop.

¶ 6.    During his employment with Green Mountain, and prior to the incident resulting in this appeal, Gauthier was subjected to at least two internal disciplinary proceedings. In July

3

2009, Green Mountain placed Gauthier on a "corrective action plan" (CAP) to resolve issues he was having with co-workers. Gauthier completed the conditions of the CAP, and the plan was terminated several months later with no further action taken.

¶ 7.    In May 2010, Gauthier received a written warning for "frequently accessing non-business sites during his shift" in violation of Green Mountain's internet-use policy. Green Mountain maintains a written policy regarding appropriate e-mail, software, and internet use. The warning informed him that if he did not immediately improve his use of time it would "result in disciplinary action up to and including termination." Gauthier understood the possible ramifications of violating the internet-use policy.

¶ 8.    On August 1, 2011, in response to a request by Gauthier's supervisor that the human resources (HR) department investigate internet use in the maintenance department, a Green Mountain HR generalist requested a "Websense" report for the month of July 2011 for eleven maintenance technicians, including Gauthier. A Websense report "provides detailed information about internet use and access in connection with a particular employee's log in information." Internet use is depicted as a number of "page hits," with each hit representing an "active 'mouse click' to select another page, from the current one."[3] Gauthier's supervisor made the request for an investigation because there was "a lack of maintenance productivity during hours" when no supervisors were present. The requested Websense report for July 2011 was generated on August 5, 2011. The report showed that, during July 2011, Gauthier had 41,750 internet hits, an amount of internet hits "more than double the internet usage that [Green Mountain] generally considered excessive usage."

¶ 9.    On August 2, 2011, the day after the HR generalist had requested the report, but several days before it had been compiled, Gauthier sustained an injury while at work. Gauthier

---

[3]    The record contains no further information regarding the nature, limitations, or accuracy of a Websense report.

4

made a workers'-compensation claim, which Green Mountain accepted, and he continued to work until the day before he underwent an operation for his injury on September 8, 2011. Following the operation, he remained out on medical leave to recover for several weeks. Also, effective August 21, 2011, Gauthier received a 12% "market adjustment" increase to his base compensation rate.

¶ 10.    On August 22, 2011, based in part on the result of the Websense report, the HR generalist submitted a disciplinary action plan to his supervisor recommending that Gauthier be terminated. The report recounted that Gauthier was not required to access the internet frequently for business purposes and that he had been "engaged in the [Green Mountain] discipline process" for several years, including being placed on a CAP and receiving a written warning for violation of Green Mountain's internet-use policy. The report concluded that "[i]t is reasonably inferred, given the CAP and then the Written Warning . . . , that [Gauthier] has not responded to counseling nor the [Green Mountain] discipline process" and that "[Gauthier] has been given ample opportunity in which to improve his performance." On September 29, 2011, the HR generalist's supervisor informed him that Green Mountain had agreed to terminate Gauthier based on his internet use. Due to the timing with Gauthier's workers'-compensation claim, however, the HR generalist was instructed to first send Gauthier a letter indicating that "there were some issues related to his performance that needed to be discussed once he returned from leave," which was sent on October 3, 2011.

¶ 11.    When Gauthier returned to work from his medical leave, he met with two Green Mountain HR generalists to discuss his July 2011 internet use as reflected in the Websense report. Gauthier denied the excessive internet use, and Green Mountain placed him on administrative leave while it investigated the matter. Green Mountain's information technology (IT) department informed the HR department that the use could have come from someone other than Gauthier only if he had shared his Green Mountain computer-login information with others.

5

Gauthier denied sharing his computer-login information, and Green Mountain subsequently terminated him on November 8, 2011. As a result of the investigation into the eleven maintenance technicians' internet use, one received a written warning, one was subjected to a CAP, and two, including Gauthier, were fired.

¶ 12. In March 2013, Gauthier filed a three-count complaint in the superior court, civil division, alleging (1) workers'-compensation retaliation; (2) breach of the implied covenant of good faith and fair dealing; and (3) intentional infliction of emotional distress. On February 13, 2014, following the completion of discovery, Green Mountain moved for summary judgment on all three counts. On March 12, 2014, one month after Green Mountain had moved for summary judgment and approximately one year after filing his complaint, Gauthier moved to amend his complaint to add two new claims: one for breach of contract and another for whistleblower retaliation. Gauthier also made two filings in opposition to summary judgment and filed a letter from a computer expert that "preliminarily suggested that the '[Websense]' report may have been misinterpreted" by Green Mountain. In a June 2014 decision, the court denied the motion to amend and entered summary judgment for Green Mountain on all three original counts. This appeal followed, with Gauthier arguing that the court erred by entering summary judgment in favor of Green Mountain on his claim for workers'-compensation retaliation and abused its discretion in denying his motion to amend his complaint. Gauthier has not appealed the trial court's grant of summary judgment in favor of Green Mountain on his claims for breach of the implied covenant of good faith and fair dealing and intentional infliction of emotional distress.

I.      Workers'-Compensation Retaliation

¶ 13. We first address Gauthier's argument that the trial court erred in entering summary judgment in favor of Green Mountain on his claim for workers'-compensation retaliation because Green Mountain's firing of him upon his return from workers'-compensation leave, in conjunction with the asserted weakness or implausibility of Green Mountain's proffered

6

reason, indicates that Green Mountain used its internet policy as a pretext to fire him in retaliation for making a workers'-compensation claim. To this end, Gauthier contends that the trial court erred in applying the summary judgment rule in that it did not grant him the benefit of all reasonable doubts and inferences and that the trial court erred in relying on a variety of the "honest belief" rule which he claims "has been widely criticized and rejected" by federal courts. We disagree and affirm.

¶ 14. We review summary judgment decisions de novo, using the same standard as the trial court. Wentworth v. Fletcher Allen Health Care, 171 Vt. 614, 616, 765 A.2d 456, 459 (2000) (mem.). Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a); see also In re Estate of Fitzsimmons, 2013 VT 95, ¶ 13, 195 Vt. 94, 86 A.3d 1026 ("An issue of fact is material only if it might affect the outcome." (quotation omitted)); Kelly v. Town of Barnard, 155 Vt. 296, 305 n.5, 583 A.2d 614, 619 n.5 (1990) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." (quotation omitted)). Although we view the record as a whole, "[i]n determining whether there is a genuine issue as to any material fact, we will accept as true the allegations made in opposition to the motion for summary judgment, so long as they are supported by affidavits or other evidentiary material." Robertson, 2004 VT 15, ¶ 15; see also Pierce v. Riggs, 149 Vt. 136, 139, 540 A.2d 655, 657 (1987) (explaining that we accept facts as alleged by nonmoving party as true only "if [they are] supported by affidavits or other evidentiary material" (quotation omitted)). In examining the record, "the nonmoving party receives the benefit of all reasonable doubts and inferences." Robertson, 2004 VT 15, ¶ 15.

¶ 15. Under Vermont law, "[n]o person shall discharge or discriminate against an employee from employment because such employee asserted . . . a claim for benefits under [Vermont's Workers'-Compensation Law] or under the law of any state or under the United

7

States." 21 V.S.A. § 710(b). In the absence of direct evidence of unlawful discharge or discrimination, as is the case here, we apply the three-part burden-shifting framework as laid out by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Robertson, 2004 VT 15, ¶ 18 ("If the plaintiff presents only circumstantial evidence of discrimination . . . the three-step burden shifting analysis of McDonnell Douglas is applied." (citing Hodgdon v. Mt. Mansfield Co., 160 Vt. 150, 162, 624 A.2d 1122, 1129 (1992)). Thus, for Gauthier to withstand Green Mountain's motion for summary judgment on his claim of unlawful retaliation for filing a workers'-compensation claim, he must first present a prima facie case of retaliatory discrimination. See Murray v. St. Michael's Coll., 164 Vt. 205, 210, 667 A.2d 294, 299 (1995); see also Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-56 (1981) ("First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination."). If he succeeds in establishing a prima facie case, Green Mountain must then come forward with a legitimate, non-discriminatory reason for the challenged conduct. Murray, 164 Vt. at 210, 667 A.2d at 299. If Green Mountain can articulate such a reason, then Gauthier will be required to show that the proffered reason was a "mere pretext" for discrimination. Id. If Gauthier cannot do so, then Green Mountain is entitled to summary judgment. Id.

### A. Prime Facie Case

¶ 16. To make out a prima facie case, Gauthier is required to show "that (1) he was engaged in a protected activity, (2) his employer was aware of that activity, (3) he suffered [an] adverse employment decision[], and (4) there was a causal connection between the protected activity and the adverse employment decision." Id.; see also McDonnell Douglas, 411 U.S. at 802 (outlining prima facie elements for a discrimination claim under Title VII of the Civil Rights Act of 1964). Gauthier's burden at this stage is "relatively light." Gallipo v. City of Rutland, 2005 VT 83, ¶ 15, 178 Vt. 244, 882 A.2d 1177; see also Burdine, 450 U.S. at 253 ("The burden

of establishing a prima facie case . . . is not onerous.").  As the United States Supreme Court has explained:

> Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee.  If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case.

Burdine, 450 U.S. at 253 (footnote omitted).

¶ 17.    Here, the parties do not dispute that Gauthier has met the first three requirements of establishing a prima facie case.  Green Mountain contends on appeal, however, as it did below, that Gauthier has not established a causal connection between his claim for workers'-compensation benefits and his subsequent termination.  Specifically, Green Mountain argues that its HR department's investigation into the eleven maintenance department workers' internet use began prior to Gauthier's workers'-compensation claim and that "[t]his fact eliminates any causal connection between [Gauthier's] injury and his termination."  In support of its argument, Green Mountain cites to our decision in Robertson, where this Court concluded that there was no causal relationship between the plaintiff's filing of gender discrimination complaints and her demotion where her demotion occurred before the claims had been filed.  2004 VT 15, ¶¶ 42, 46.

¶ 18.    Robertson is distinguishable from this case.  In Robertson, in part relevant here, the plaintiff complained that she had been demoted from "Senior Project Manager" to "Project Manager" as a result of her filing gender-discrimination complaints with her employer and the Vermont Attorney General's office.  Id. ¶ 43.  The record revealed, however, that the plaintiff's demotion occurred prior to her filing the complaints and thus this Court concluded that "the causation element of the prima facie case is not satisfied."  Id. ¶ 46.  In this case, the record on appeal reveals that, although Green Mountain's request for the Websense report for Gauthier's internet use was made the day prior to his injury, Green Mountain's decision to terminate him

was not made until <u>after</u> he had filed his workers'-compensation claim. Here, unlike in <u>Robertson</u>, the adverse employment action (termination) occurred after the protected activity had taken place (filing a workers'-compensation claim), and thus <u>Robertson</u> does not control.

¶ 19. Gauthier was injured on August 2, 2011 and Green Mountain terminated him on November 8, 2011—within several months of his claim for workers'-compensation benefits and within weeks of his return to work from the injury. This temporal proximity between the adverse-employment decision and the protected activity is sufficient under the burden-shifting analysis outlined above to meet Gauthier's initial "relatively light" burden of establishing the causation portion of a prima facie case for workers'-compensation retaliation. See, e.g., <u>Murray</u>, 164 Vt. at 212, 667 A.2d at 300 (timing of adverse employment decision relative to the filing of a workers'-compensation claim is sufficient, for purposes of a prima facie case, to establish a causal connection (citing <u>Gallipo v. City of Rutland</u>, 163 Vt. 83, 93, 656 A.2d 635, 642 (1994)); see also <u>El Sayed v. Hilton Hotels Corp.</u>, 627 F.3d 931, 932 (2d Cir. 2010) (per curiam) ("By demonstrating temporal proximity between his complaint and his discharge, [the plaintiff] arguably established a prima facie case of retaliation under Title VII."); <u>Seeger v. Cincinnati Bell Tel. Co.</u>, 681 F.3d 274, 284 (6th Cir. 2012) (concluding, in addressing causal-link requirement for establishing prima facie case of retaliation under federal Family and Medical Leave Act, that "the nearness in time between [the plaintiff's] return from FMLA leave and his termination— three weeks after his reinstatement and less than two months after he first notified [the defendant] of his medical leave—suffices in these circumstances to meet the low threshold of proof necessary to establish a prima facie case of retaliatory discharge").

B. Legitimate, Non-Discriminatory Reason

¶ 20. Because we conclude that Gauthier made out a prima facie case for retaliation, the burden then shifts to Green Mountain to articulate "some legitimate, nondiscriminatory reason for the challenged conduct." <u>Murray</u>, 164 Vt. at 210, 667 A.2d at 299. At this point in the

summary judgment proceedings, "defendants have only a burden of production, rather than one of persuasion." Robertson, 2004 VT 15, ¶ 31; see also Burdine, 450 U.S. at 253 ("The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."). "In order to prevent summary judgment in favor of the plaintiff at this stage, [the employer's] explanation must, if taken as true, 'permit the conclusion that there was a nondiscriminatory reason for the adverse action.' " Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 123 (2d Cir. 2004) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted . . . ." Burdine, 450 U.S. at 255 (footnote omitted).

¶ 21. The record establishes that Green Mountain produced evidence that Gauthier used the internet in violation of its internet-use policy during July 2011 and had been involved in two other internal disciplinary proceedings in the past, including a previous warning for a violation of Green Mountain's internet-use policy in May 2010. Green Mountain's proffered reason, as the trial court found, and as Gauthier concedes, if taken as true, would permit the conclusion that Gauthier was terminated for a legitimate, non-discriminatory reason. See, e.g., Sarkis v. Ollie's Bargain Outlet, 560 F.App'x 27, 30 (2d Cir. 2014) (accepting violation of store policy as legitimate, non-retaliatory reason for disciplining and terminating employee); Desardouin v. City of Rochester, 708 F.3d 102, 106 (2d Cir. 2013) (recognizing termination of employee for violation of departmental policy as legitimate and non-discriminatory); Hamza v. Saks Inc., 533 F.App'x 34, 36 (2d Cir. 2013) ("[The defendant] proffered highly persuasive evidence that [the plaintiff] was terminated because of deficiencies in her performance, her inadequate customer service skills, her inability to work well with others and her failure to comply with [the defendant's company] policies.").

## C. Pretext

¶ 22. Finally, because Green Mountain has articulated a legitimate, non-discriminatory reason for the Gauthier's termination, Gauthier must present evidence from which a factfinder could reasonably conclude that such reason was a "mere pretext." See Murray, 164 Vt. at 210, 667 A.2d at 299. Bluntly stated, to show pretext, a plaintiff must establish that the defendant's proffered legitimate, non-discriminatory reason is a lie. See, e.g., Castro v. DeVry Univ., Inc., 786 F.3d 559, 565 (7th Cir. 2015) ("To show pretext, an employee must present evidence suggesting that the employer is dissembling." (quotation omitted)); Smith v. Chrysler Corp., 155 F.3d 799, 805-06 (6th Cir. 1998) ("In challenging an employer's action, an employee 'must demonstrate that the employer's reasons (each of them, if the reasons independently caused [the] employer to take the action it did) are not true.' " (emphasis omitted) (quoting Kariotis v. Navistar Int'l Transp. Corp., 131 F.3d 672, 676 (7th Cir. 1997)). Of course, to establish pretext and thus survive summary judgment, "a plaintiff is not required to come forward with evidence of the 'smoking gun' variety," Resare v. Raytheon Co., 981 F.2d 32, 43 (1st Cir. 1991); rather, because the plaintiff "bears the ultimate burden of persuasion, [the plaintiff] must adduce enough evidence of discrimination so that a rational fact finder can conclude that the adverse job action was more probably than not caused by discrimination," Back, 365 F.3d at 123. A plaintiff can carry this burden "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846 (2d Cir. 2013); Castro, 786 F.3d at 565. If the plaintiff cannot meet that burden, then the defendant is entitled to summary judgment. See Wentworth, 171 Vt. at 618, 765 A.2d at 462.

¶ 23. In ruling on Green Mountain's motion for summary judgment, the trial court concluded that Gauthier had not adduced sufficient evidence such that a reasonable juror could

conclude that Green Mountain's proffered reason was pretextual. The court found that Gauthier had offered nothing to counter Green Mountain's proffered reason other than to allege, without factual support, that Green Mountain "was suspicious of [Gauthier's] worker compensation claim." The court concluded that suspicions alone, even if factually supported, would be insufficient to establish that Gauthier's termination had been retaliatory and explained that, without more, temporal proximity between a protected activity and an adverse employment action is insufficient to establish pretext. See Davies v. New York City Dep't of Educ., 563 F.App'x. 818, 820-21 (2d Cir. 2014). Accordingly, the court entered judgment for Green Mountain.

¶ 24. Additionally, in regard to Gauthier's supplemental memorandum suggesting that Green Mountain's reliance on the Websense report was misplaced, the trial court concluded that "[a]n employer can make bad or incorrect decisions, but so long as they are not motivated by an improper reason (such as, for example, discrimination or retaliation), they are not grounds for recovery by the employee." The trial court, citing to American Jurisprudence, set forth that, "[u]nder the 'honest belief' rule, as long as an employer has an honest belief in its proffered nondiscriminatory reason for its employment action, an employee cannot establish that the reason is pretextual even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless." See 45B Am. Jur. 2d Job Discrimination § 956. The court explained that Gauthier had offered no evidence that Green Mountain "actually knew—or even should have known—that the [Websense] report was being misinterpreted" and that even the preliminary letter from Gauthier's computer expert suggests that Websense reports "are inherently confusing and easily misunderstood." Ultimately, the court concluded that "[t]here is just no evidence before the court to suggest that [Green Mountain] used this report as a pretext for some improper termination decision." Without some evidence that Green Mountain did something more sinister than simply get it wrong, the trial court determined that Gauthier did not meet his burden. See

Johnson v. Weld Cnty., 594 F.3d 1202, 1211 (10th Cir. 2010) ("That individuals and companies sometimes make employment decisions that prove to be bad ones in hindsight usually suggests no more than that—that they got it wrong. To support an inference of pretext, to suggest that something more nefarious might be at play, a plaintiff must produce evidence that the employer did more than get it wrong. He or she must come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda.").

¶ 25. Gauthier contends that the trial court misconstrued the record evidence when it relied on a version of the "honest belief" rule that he contends has been "widely criticized and rejected." Gauthier argues that before an employer's belief can be credited as honest, the employer must first establish that its decision was premised on reasonable reliance on particularized facts. Gauthier contends that, when viewed under that standard, the temporal proximity between his workers'-compensation claim and his termination, in addition to three record facts, show the weakness and implausibility in Green Mountain's proffered reason such that it is unworthy of credence. He therefore argues a jury question exists as to whether Green Mountain's proffered reason was but pretext for an unlawful motivation. Specifically, Gauthier points to the following facts as undermining Green Mountain's honest belief: (1) Green Mountain did not rule out that another worker could and did use Gauthier's password; (2) Gauthier's denial of excessive internet use is supported by the absence of evidence that his job productivity was poor during that time and that "by all accounts, [Gauthier's] performance was exemplary" and that in August of 2011 he received a 12% "merit pay increase"; and (3) the Websense report shows Gauthier was accessing websites such as Facebook, a site that Gauthier has stated he does not use.

¶ 26. We begin by addressing the proper application of the "honest belief" rule. The parties' briefing indicates that a split between the United States Courts of Appeal for the Sixth

14

and Seventh Circuits has been percolating since at least the late 1990s. See generally Rebecca Michaels, Note, Legitimate Reasons for Firing: Must They Be Reasonable?, 71 Fordham L. Rev. 2643, 2643, 2657-67 (2003) (analyzing the split between the United States Courts of Appeal for the Sixth and Seventh Circuits "regarding whether an employer's belief in its legitimate nondiscriminatory reason for firing an employee must simply be honest or must also be reasonable"). The substance of the split revolves around whether an employer's belief in its proffered legitimate, non-discriminatory reason need merely be honestly believed, see Kariotis, 131 F.3d at 676, or whether, before an employer's belief will be accepted as honest by a court, the employer must first establish that it stems from a reasonable reliance on particularized facts, see Smith, 155 F.3d at 806.

¶ 27. The Seventh Circuit's articulation of the rule, which Gauthier contends should not be applied by this Court, simply requires that an employer honestly believe in its proffered reasons, "even if the reasons are foolish or trivial or baseless." See Kariotis, 131 F.3d at 676; see also McCoy v. WGN Cont'l Broad. Co., 957 F.2d 368, 373 (7th Cir. 1997) ("[T]he issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers."); Visser v. Packer Eng'g Assocs., Inc., 924 F.2d 655, 658-59 (7th Cir. 1991) (concluding that termination for an unethical reason is not evidence of age discrimination); Pollard v. Rea Magnet Wire Co., 824 F.2d 557, 560 (7th Cir. 1987) ("No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, Title VII and § 1981 do not interfere."). Under this standard, "arguing about the accuracy of the employer's assessment is a distraction, because the question is not whether the employer's reasons for a decision are right but whether the employer's description of its reasons is honest." Kariotis, 131 F.3d at 677 (internal citation and quotation marks omitted). Thus, in order for a plaintiff to prevail at the pretext stage, the plaintiff "must demonstrate that

the employer's reasons (each of them, if the reasons independently caused [the] employer to take the action it did) are not true. Moreover, if the company honestly believed in those reasons, the plaintiff loses even if the reasons are foolish or trivial or baseless." Id. at 676 (internal citation omitted); see also Clay v. Holy Cross Hosp., 253 F.3d 1000, 1007 (7th Cir. 2001) ("To prove pretext, [an employee] must present facts that cast doubt on the [employer's] specific reasons for [the employee's] termination.").

¶ 28.    Gauthier advocates for a stricter construction of the rule as developed in the Sixth Circuit, which requires slightly more of an employer. In Smith v. Chrysler Corp., the Sixth Circuit expressly rejected the reasoning of the Seventh Circuit in Kariotis, explaining, "[t]o the extent the Seventh Circuit's application of the 'honest belief' rule credits an employer's belief without requiring that it be reasonably based on particularized facts rather than on ignorance and mythology, we reject its approach." 155 F.3d at 806. Rather, instead of a defendant-employer merely honestly believing in its proffered reason for termination, the Smith Court required that an employer also establish its "reasonable reliance on particularized facts."

> [I]n order for an employer's proffered non-discriminatory basis for its employment action to be considered honestly held, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made. If the employer is unable to produce such evidence to support its employment action, then the "honest belief" rule does not apply.

Id. at 807 (citing Pesterfield v. Tennessee Vall. Auth., 941 F.2d 437, 443-44 (6th Cir. 1991)). Once such a showing has been made, "the protection afforded by the rule is not automatic," and "the employee has the opportunity to produce proof to the contrary." Id. (quotation omitted). This test does "not require that the decisional process used by the employer be optimal or that it left no stone unturned"; "[r]ather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." Id. The Smith Court further explained:

16

> Although courts should resist attempting to micro-manage the process used by employers in making their employment decisions, neither should they blindly assume that an employer's description of its reasons is honest. When the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process "unworthy of credence," then any reliance placed by the employer in such a process cannot be said to be honestly held.

Id. at 807-08.

¶ 29. This Court has not yet addressed which, if either, application of the "honest belief" rule is appropriate when addressing the issue of pretext under the McDonnell Douglas three-part burden-shifting test. We conclude that the Seventh Circuit's articulation of the "honest belief" rule is more appropriate, and thus we hold that an employer need only honestly believe in its proffered legitimate, non-discriminatory reason for the challenged adverse employment action in order to prevail on a motion for summary judgment at the pretext stage.

¶ 30. We reach this conclusion because the Seventh Circuit's articulation more closely tracks the public policy rationale underlying Vermont's anti-retaliation statute. As this Court has recognized, "[w]orkers' compensation law represents a public policy compromise in which the employee gives up the right to sue the employer in tort in return for which the employer assumes strict liability and the obligation to provide a speedy and certain remedy for work-related injuries." See Murray, 164 Vt. at 209, 667 A.2d at 298 (quotation omitted). Clearly, it would be unacceptable to allow an employer to undermine this critical public-policy compromise by either discriminating or retaliating against an employee who sought out a remedy for a work-related injury. See id. at 209-10, 667 A.2d at 298. This is the reasoning underlying the anti-retaliation provision, see 21 V.S.A. § 710(b), and in large part why we held in Murray that a private right of action for monetary damages under § 710 is appropriate. See id. at 208-10, 667 A.2d at 298-99 (explaining that the limited remedies available under § 710 at the time would "be further augmented by the employee's right to obtain civil redress"). Section 710(b) is intended to

17

prevent action by an employer taken in retaliation for, and thus because of, the filing of a claim for compensation.

¶ 31.    Of course, § 710(b) holds an employer liable only where it can be shown that the employer has in fact retaliated or discriminated "against an employee from employment because such employee asserted or attempted to assert a claim for benefits."  If an employer has terminated an employee following a claim for workers'-compensation benefits but has done so for what is a legitimate, non-discriminatory reason that it honestly believes to be true, even if that reason ultimately is shown to have been incorrect, then there can be no intent to retaliate or discriminate in violation of the public policy compromise.

¶ 32.    It is important not to lose sight of the fact that Vermont's anti-retaliation statute is not aimed at protecting workers from receiving adverse employment decisions for non-discriminatory or non-retaliatory reasons, or even for reasons that might strike a reasonable person as poorly made or unwise.  Rather, it is aimed at ensuring workers are not subject to adverse-employment decisions for discriminatory or retaliatory reasons.  See Robertson, 2004 VT 15, ¶ 35 ("This Court may not second-guess an employer's non-discriminatory business decisions, regardless of their wisdom." (quotation omitted)).  As the Seventh Circuit explained, an employer cannot have the intent to discriminate where the reason proffered for the challenged adverse employment action is in fact determined to be legitimate and non-discriminatory and is honestly believed.  See, e.g., Little v. Ill. Dep't of Revenue, 369 F.3d 1007, 1012 n.3 (7th Cir. 2004) (rejecting the invitation to adopt the Sixth Circuit's articulation of the honest-belief rule, noting that the indirect method of proving unlawful discrimination "is, after all, a means of proving intentional discrimination"); see also Michaels, supra, at 2667 (advocating that courts adopt the so-called "pure" honest-belief rule because "[t]here can be no intent to discriminate if an employer has an honest and legitimate nondiscriminatory reason for the [adverse employment] action").  And thus we agree with the Kariotis Court that "arguing about the

18

accuracy of the employer's assessment is a distraction because the question is not whether the employer's reasons for a decision are right but whether the employer's description of its reasons is honest." 131 F.3d at 677 (internal citations and quotation marks omitted). The critical piece in an analysis of pretext in a discrimination or retaliation claim is whether a plaintiff can provide sufficient evidence such that a reasonable juror could conclude that the employer's proffered legitimate, non-discriminatory reason was not in fact its real reason for taking an adverse job action. Whether an employer's reason for the adverse employment action is ultimately shown to be well advised or not is beside the point.

¶ 33. Therefore, in order to establish pretext, the employee must call the employer's honesty or credibility into question by rebutting the proffered reason with facts from which a factfinder could reasonably conclude that the proffered reasons are unworthy of credence. See e.g., Castro, 786 F.3d at 565; Clay, 253 F.3d at 1007. We emphasize that the proffered reason that the employer honestly believes must, of course, be a legitimate, non-discriminatory reason for the challenged adverse employment action.

¶ 34. Under this standard, we conclude that Gauthier has not presented evidence from which a jury could infer that Green Mountain did not honestly believe in its proffered reason. The three record facts highlighted by Gauthier, even taken together with the temporal proximity of his termination following his workers'-compensation claim and giving Gauthier the benefit of all reasonable doubts and inferences, do not require a denial of Green Mountain's motion for summary judgment on the ground that Green Mountain could not have honestly believed in its proffered reason because it was unworthy of credence.

¶ 35. As to his first point, the record reflects that, at best, on several occasions while Gauthier was away from his logged-in computer responding to a maintenance call, another worker had accessed Gauthier's account, without his permission, and altered his computer's desktop background image. Nothing in the record suggests that another worker had ever used

Gauthier's Green Mountain computer-login credentials for an extended period of time or for accessing the internet, let alone to the degree shown in the Websense report, nor that Green Mountain was aware that Gauthier's password had been compromised such that the Websense results for his computer account for the month of July 2011 should have been considered suspect. Even giving Gauthier all reasonable inferences and doubts, this evidence does not suggest that Green Mountain's stated reason for termination was pretextual such that a reasonable juror could find in Gauthier's favor.

¶ 36. Gauthier's next factual contention is similarly without merit. Green Mountain did not proffer that it terminated Gauthier for poor job productivity—it terminated him solely on the basis of a violation of its internet-use policy. Nevertheless, Gauthier argues that "had he been so busy using the internet, which according to [Green Mountain] would have accounted for nearly all of his time at work, he could not have performed his job." He contends that, "[a]t a minimum, his productivity would have been adversely affected. Yet [Green Mountain] has not a shred of evidence to that effect, making its asserted basis . . . implausible." He further suggests that "by all accounts, [his] performance was exemplary" and notes that in August 2011 he received a 12.12% raise, which, at the trial level, he suggested was "merit-based."

¶ 37. Gauthier misapplies the allocation of burdens under the applicable burden-shifting test. Upon Gauthier making out a prima facie case of retaliatory discrimination, Green Mountain's burden was to produce evidence of a legitimate, non-discriminatory reason for his termination which, if taken as true, would permit the conclusion that his termination was legitimate, which it has done. In response, Gauthier's burden was to adduce sufficient evidence of retaliatory termination such that a reasonable juror could find that Green Mountain's proffered reason was pretextual, which this evidence does not. It is insufficient to merely speculate that the absence of evidence of poor job performance and an indication of "exemplary" performance

20

necessarily leads to the conclusion that Green Mountain's proffered legitimate, non-discriminatory reason of excessive internet use is pretextual.

¶ 38. The absence of evidence of poor job performance or the existence of evidence of "exemplary" job performance does not constitute evidence of the absence of internet misuse—even a high-performing employee could violate a company's internet-use policy. What is missing from Gauthier's challenge to Green Mountain's motion for summary judgment is competent evidence showing that he would not have had the time to misuse the internet to the extent that the Websense report has suggested and still get his job done and that Green Mountain knew this. Although the record evidence indicates some reason to believe that the internet usage indicated by the Websense report would have accounted for a large portion of his hours worked during July 2011, there is no evidence that he could not have performed his job and also used the internet as alleged. Extrapolating out all inferences in Gauthier's favor from his expert's letter, there is some reason to be skeptical of the Websense results—but not in that it shows he could not have performed his job if the allegations are true. Rather, the inference is that perhaps the report had picked up hits unrelated to his actual internet use. But even if Gauthier's computer expert is correct that "the computer being used was infected with computer Viruses, Trojans, Malware, Browser Toolbars and possibly a keylogger" and that "[Websense] reports are often known to record hits and [] it could be misleading in certain circumstances and infections could multiply these factors greatly," Gauthier has failed to establish that Green Mountain did not honestly believe in its proffered legitimate, non-discriminatory reason. Ultimately, the accuracy of the Websense report is not at issue because the validity of the results is not the test for pretext. What is critical here is that the expert's report does not say that the Websense report results on their face are so completely out of the ordinary that no reasonable employer could have honestly believed them to be true. We agree with the trial court that this evidence essentially shows that these Websense reports are confusing and perhaps difficult to read; but what it does not show is

that Green Mountain was dishonest in its proffer that it honestly relied on the Websense report in terminating Gauthier for a violation of its internet-use policy.

¶ 39. Finally, Gauthier contends that he informed Green Mountain that he does not use Facebook and argues that Green Mountain "could easily have confirmed that [Gauthier] did not have a Facebook account and therefore could not have accessed Facebook as Websense reported he had done repeatedly." In further support of this contention, Gauthier references the letter from his computer expert.

¶ 40. Again, this argument is not convincing. The record shows that, upon return from leave, Gauthier met with two members of Green Mountain's HR department to discuss the results of the Websense report for July 2011. At that meeting, the HR department told Gauthier that they suspected he had violated Green Mountain's internet-use policy based on the Websense report and that the report showed he had accessed various websites, including Facebook. Gauthier responded adamantly that he does not use Facebook, and Green Mountain placed him on administrative leave while it investigated the matter. Thereafter, the record shows that the HR department inquired with the IT department as to whether it was possible for someone else to have been responsible for the internet hits shown on Gauthier's Websense report. The IT department told the HR department that the only way that was possible was if Gauthier had shared his computer-login information with another worker. Gauthier denied sharing his password, and Green Mountain terminated him.

¶ 41. Even giving Gauthier the benefit of all reasonable inferences, he has not met his burden to create a genuine issue of material fact precluding summary judgment. At best, this suggests that the Websense report inaccurately reported certain internet hits to Facebook and that Green Mountain's reliance on the Websense report may have ultimately been misplaced. Of course, we do not require an employer to be correct. What we require is that an employer honestly believe in its proffered legitimate, non-discriminatory reason, even if that reason is

ultimately shown to have been wrong. What it does not show, however, are weaknesses or implausibilities in Green Mountain's proffered non-discriminatory reason such that a reasonable jury could conclude that Green Mountain used the alleged violation of its internet-use policy as a pretext for retaliating against Gauthier for making a workers'-compensation claim. What makes this insufficient to defeat Green Mountain's motion for summary judgment is that there is no evidence that Green Mountain lacked an honest belief as to the content of the Websense report. That Gauthier's expert identified issues with the Websense report is insufficient to create an issue concerning Green Mountain's honest belief unless his expert can also say that those deficiencies are such that it would be unreasonable for Green Mountain to rely on the report. Indeed, following the HR department's discussion with Gauthier on his return from leave, the HR department specifically inquired with the IT department whether there was any basis for Gauthier's denial of excessive use. Because Gauthier denied the one possibility that the IT department presented, i.e., Gauthier having shared his password with another worker, Gauthier has failed to adduce sufficient evidence that Green Mountain used the alleged violation of its internet-use policy as a pretextual reason for retaliating against him for filing a workers'-compensation claim such that a reasonable jury could find in his favor.

## II.    Motion to Amend Complaint

¶ 42.    Gauthier also argues that the trial court abused its discretion by denying his motion to amend his complaint which, although filed after Green Mountain had moved for summary judgment, was filed before his response to the summary-judgment motion was due and three months before the trial court entered summary judgment in favor of Green Mountain.

¶ 43.    Under the Vermont Rules of Civil Procedure, amendments to the pleadings may be allowed at any time "by leave of court," V.R.C.P. 15(a), and "trial courts are to be liberal in permitting amendments to the pleadings," Lillicrap v. Martin, 156 Vt. 165, 170, 591 A.2d 41, 44 (1989). As we have explained:

23

> The principal reasons underlying the liberal amendment policy are (1) to provide maximum opportunity for each claim to be decided on its merits rather than on a procedural technicality, (2) to give notice of the nature of the claim or defense, and (3) to enable a party to assert matters that were overlooked or unknown to him at an earlier stage in the proceedings.

Id. (quoting Bevins v. King, 143 Vt. 252, 255, 465 A.2d 282, 283 (1983)). Rulings on motions to amend are entrusted to the sound judgment of the trial court, and we will reverse only where there is an abuse of discretion. Id. "When there is no prejudice to the objecting party, and when the proposed amendment is not obviously frivolous nor made as a dilatory maneuver in bad faith, it is an abuse of discretion to deny the motion." Bevins, 143 Vt. at 254-55, 465 A.2d at 283; see also Obolensky v. Trombley, 2015 VT 34, ¶ 43, ___ Vt. ___, 115 A.3d 1016 (reciting that abuse of discretion will be found only where court failed to exercise its discretion, exercised it on untenable grounds, or exercised it to an extent clearly unreasonable).

¶ 44. Here, in denying Gauthier's March 12, 2014 motion to amend his complaint, the trial court concluded that Gauthier had not made a sufficient showing of "good cause" to justify the delay in filing the amendment—almost one year after the initiation of the suit and two weeks after Green Mountain had filed for summary judgment. The court explained:

> While the court freely grants amendments of complaints at the start of a case, once the other party has filed a summary judgment motion the court is less willing to do so. The court is much more hesitant to allow an amendment at that stage of the case because the other side has already marshaled its resources to respond to the allegations made in the existing complaint. The court requires good cause for the delay in raising new claims at this stage.

In response to Gauthier's justification for the delay—that Green Mountain had not produced any documentation regarding the alleged number of internet hits until November 2013—the court observed that such documentation has nothing to do with the two new claims—breach of contract and whistleblower retaliation—and that the new claims "are not based upon any new information, and would require an entirely new round of summary judgment motions."

24

¶ 45.     Gauthier argues that "[t]here simply is no rule, as pronounced by the trial court, that requests to amend must be denied when the opposing party has filed a summary judgment [motion]" and that "the rule seems to be the contrary." He further argues that there was no showing of bad faith and that the new claims are not "obviously frivolous."

¶ 46.     Contrary to Gauthier's characterization, however, the trial court did not deny his motion to amend because Green Mountain had already filed for summary judgment. Rather, the record reflects that the court exercised its discretion in a considered manner and balanced the policy objectives outlined above. Specifically, the court observed that Gauthier's proffered justification for the delay—Green Mountain's production of documents in November 2013—was not the basis for the new claims sought to be added to the complaint and further noted that Green Mountain had already "marshaled its resources to respond to the allegations made in the existing complaint." These conclusions are all supported by the record and are in accord with the policy objectives underlying Rule 15.

¶ 47.     The issue is not whether we would have granted the motion to amend had we been similarly situated; nor is it whether the lower court could have granted the motion to amend in the proper exercise of its discretion. Rather, the issue is whether the denial of the motion constituted an abuse of discretion. For the reasons stated herein, we find the court did not abuse its discretion in denying Gauthier's motion to amend.

Affirmed.

FOR THE COURT:

_____
Associate Justice

25